255 P.3d 739 (2011)
161 Wash.App. 581
Leo McMilian, an individual, Respondent,
v.
KING COUNTY, a Washington municipal corporation, Appellant,
Sherry McMilian, an individual, Defendant.
No. 64868-3-I.
Court of Appeals of Washington, Division 1.
May 2, 2011.
*741 Cristy J. Craig, King County Prosecuting Office, Seattle, WA, for Appellant.
Jean Barr Jorgensen, Singleton & Jorgensen Inc. PS, Renton, WA, Dalynne Singleton, Singleton & Jorgensen Inc. PS, Port Orchard, WA, for Respondent.
Sherry McMilian, Maple Valley, WA, for Other Party.
*742 DWYER, C.J.
¶ 1 Valid nonconforming uses of land are permitted where those uses were lawfully established prior to the adoption of contrary zoning legislation. The requirement that the use be lawfully established is not limited to compliance with zoning legislation but, rather, also demands compliance with general statutory requirements. Although such nonconforming uses are disfavored, they are permitted to continue in order to avoid constitutional due process concerns arising from interference with a landowner's property rights. Such constitutional concerns do not arise, however, where a trespasser establishes the use. Thus, we hold that a trespasser onto land cannot lawfully establish a valid nonconforming use.
¶ 2 Nevertheless, a user of another's land will not be presumed to be trespassing upon that land. Because the hearing examiner herein improperly presumed that the user of neighboring land was trespassing, we remand for additional findings on the issue of whether a valid nonconforming use existed. We affirm the hearing examiner's decision that a clearing permit was required.

I
¶ 3 Leo McMilian owns two adjacent parcels on the west side of Enchanted Parkway South in the unincorporated area east of Federal Way. He currently operates an automobile wrecking yard on both parcels. McMilian purchased the northern parcel (parcel number XXXXXX-XXXX) and the wrecking yard business associated with that property in 2002. Several months later, McMilian purchased the southern parcel (parcel number XXXXXX-XXXX). McMilian appears to be the first wrecking yard owner to own both the northern and southern parcels. Both parcels are currently zoned to allow residential development.
¶ 4 The northern parcel has been used as a wrecking yard business since prior to 1958. In 1958, King County's zoning ordinances were amended such that a wrecking yard use was prohibited in the area. However, the wrecking yard use on the northern parcel remains a valid nonconforming use. The southern parcel was primarily forested land and seems to have been used by the prior owners only for logging purposes. Prior owners of the northern parcel had also used part of the southern parcel for the wrecking yard business and, thus, the wrecking yard "bulged" past the northern parcel's property lines. Various owners of the southern parcel had offered to sell the property to at least one of the previous owners of the northern parcel prior to the sale to McMilian being consummated.
¶ 5 In 2005, McMilian cleared the southern parcel of much of the vegetation and placed numerous vehicles on it. Thereafter, the King County Department of Development and Environmental Services (DDES) investigated complaints regarding the southern parcel.
¶ 6 In 2007, DDES issued a notice of King County Code violations, which included the following violations:
1. Operation of an auto wrecking business from a residential site that does not meet the requirements for a home occupation in violation of Section 21A.30.080 (and the allowed use section that the use would be under such as contractor' [sic] storage yard etc) of the King County Code.
2. Cumulative clearing and grading of over 7,000 square feet without the required permits, inspections, and approvals.
3. Construction of a fence over 6 feet in height without the required permits, inspections, and approvals in violations of Sections 21A12.170, 21A14.220 of the King County Code, and Section 105.2 of the International Building code.
Clerk's Papers (CP) at 14. The notice ordered McMilian to abate his wrecking yard use of the southern property and to obtain the necessary permits for the clearing activity and for the over-height fence.
¶ 7 McMilian administratively appealed the notice of violation to the Office of the Hearing Examiner for King County. McMilian argued, in part, that the operation of the wrecking yard on the southern parcel was a valid nonconforming use because the wrecking *743 yard business had spilled over onto the southern parcel for years. After an administrative hearing, the hearing examiner issued his report and decision on May 26, 2009. The hearing examiner found, in pertinent part:
4. An auto wrecking business has long been conducted on the property directly abutting to the north, under a series of ownerships. During prior ownerships, some spillover of the auto wrecking operation occurred onto the subject property, which was not owned by the prior ownerships of the auto wrecking business (it was purchased by Appellants after their purchase of the main Astro Auto Wrecking site abutting to the north). The spillover consisted of storage of some wrecked and dismantled cars and numerous junk auto parts and tires. The property was not utilized in active auto wrecking operations as was the main operation to the north.
5. No express permission was granted by the owners of the subject property to the prior operators of the auto wrecking business to the north to utilize the subject property for auto wrecking/auto storage purposes or any other related activity. Neither was eviction commenced.
6. A prior owner of the adjacent property, Richie Horan, testified that he was never asked to discontinue use of the property in the spillover auto wrecking/auto storage activity. He considered purchasing the subject property but never did, and speculated whether there was a possibility of adverse possession by his usage, though no adverse possession claim was ever made or asserted.
7. Upon their purchase of the subject property, the Appellants in or around 2005 commenced clearing of the subject property of its significant overstory and underbrush vegetation and removal of a substantial amount of auto parts, tires, a few vehicles, etc. The tree cover was so substantial that the vehicles, auto parts, etc., were not visible (at least not easily discernible) from aerial photographs taken prior to the time of clearing.
8. In clearing the property of vegetation, approximately 1.7 acres, or the vast majority, of the 1.9-acre property was cleared.
9. With some exceptions where the threshold is zero, not applicable here, clearing of vegetation in excess of 7,000 square feet of area must be conducted under the auspices of a clearing and grading permit. [KCC 16.82.051]
10. No clearing and grading permit was obtained for the clearing activity.
CP at 110 (footnote omitted).[1]
¶ 8 The hearing examiner then concluded, as a matter of first impression in Washington, that a trespasser using property cannot establish a valid nonconforming use:
Particularly given the context of nonconforming uses being disfavored in the law, and of the allowance of nonconforming uses to continue chiefly in order to respect private property rights ..., the requirement that there be a lawful establishment of the nonconforming use must logically include that it had been established under due property ownership or permission, i.e., not merely by trespass, criminal or not. Mere silent acquiescence (as asserted) by lack of expression of a demand to vacate is insufficient to accord [the prior owner of the northern parcel] a possessory or permission claim which would support a conclusion of legal nonconforming rights. It belies common sense to conclude that a person who operates a land use on property not owned by that person, without permission to operate such use, and without adverse possession, has established a lawfully *744 operated use and a property right which must then be accorded disfavored nonconforming use status.
CP at 111-12. The hearing examiner further concluded that "[t]he subject property does not benefit from a nonconforming use right to an auto wrecking yard or an auto storage yard." CP at 112. Moreover, the hearing examiner sustained the other two charges of violation for the clearing activity and the overheight fence.[2]
¶ 9 McMilian filed a petition pursuant to the Land Use Petition Act (LUPA), chapter 36.70C RCW, in the King County Superior Court, challenging the hearing examiner's decision. The superior court requested additional briefing on the issue of an individual's status for purposes of establishing a nonconforming use. The superior court then reversed the hearing examiner's decision except as to the violation related to the fence, an issue that the superior court determined McMilian had abandoned. The superior court explained:
The Hearing Examiner concluded that ... to be lawfully established, such a non-conforming use must be established through property ownership or permission, and not trespass.... I conclude the better reasoning is that lawful use relates to whether the use was lawful under the zoning laws in effect, not whether the user was a trespasser.
CP at 736. The superior court thus found "that the Hearing Examiner erred in concluding that the right to maintain a nonconforming use depends upon ownership of the land, as opposed to being a right that attaches to, and runs with, the land." CP at 733. The superior court determined "that the King County Hearing Examiner's decision that the subject parcel does not constitute a legal nonconforming use should be reversed." CP at 733.
¶ 10 King County appeals.

II
¶ 11 Review here is governed by the LUPA. In a LUPA appeal, we review the decision of the "local jurisdiction's body or officer with the highest level of authority to make the determination." RCW 36.70C.020(2); Citizens to Preserve Pioneer Park LLC v. City of Mercer Island, 106 Wash.App. 461, 474, 24 P.3d 1079 (2001). We stand "in the shoes of the superior court" and our review is limited to the record before the hearing examiner. Pavlina v. City of Vancouver, 122 Wash.App. 520, 525, 94 P.3d 366 (2004); RCW 36.70C.120(1). To obtain relief from a hearing examiner's land use decision, the party seeking relief must establish that one of six bases listed in RCW 36.70C.130(1) has been satisfied.[3]
¶ 12 McMilian seeks relief from the hearing examiner's decision pursuant to RCW 36.70C.130(1)(b), (c), (d), and (f), contending that the hearing examiner erroneously interpreted the law, erroneously applied the law to the facts, failed to base findings of fact on substantial evidence, and violated McMilian's constitutional rights in making his decision.
¶ 13 We review de novo claimed errors of law. Girton v. City of Seattle, 97 Wash.App. 360, 363, 983 P.2d 1135 (1999). The hearing examiner's decision as a whole is reviewed for substantial evidence. City of Univ. Place v. McGuire, 144 Wash.2d 640, 647, 30 P.3d 453 (2001).

*745 III
¶ 14 McMilian first contends that the hearing examiner erroneously interpreted the law by determining that a nonconforming use cannot be established by a trespasser and, further, by presuming that a person using land is a trespasser in the absence of an explicit agreement with the landowner to use that land. We agree with the hearing examiner that a trespasser cannot establish a valid nonconforming use but disagree that there is a presumption of trespass.
¶ 15 Generally, "[a] nonconforming use is a use which lawfully existed prior to the enactment of a zoning ordinance, and which is maintained after the effective date of the ordinance, although it does not comply with the [current] zoning restrictions applicable to the district in which it is situated." Rhod-A-Zalea & 35th, Inc. v. Snohomish County, 136 Wash.2d 1, 6, 959 P.2d 1024 (1998). A particular nonconforming use "is defined in terms of the property's lawful use established and maintained at the time the zoning [causing nonconformance] was imposed." Miller v. City of Bainbridge Island, 111 Wash.App. 152, 164, 43 P.3d 1250 (2002) (emphasis omitted). "The use of property must actually be established prior to the adoption of the zoning ordinance to qualify as a nonconforming use thereafter." Anderson v. Island County, 81 Wash.2d 312, 321, 501 P.2d 594 (1972) (citing State ex rel. Smilanich v. McCollum, 62 Wash.2d 602, 384 P.2d 358 (1963)).
¶ 16 "Legal, nonconforming uses are vested legal rights." First Pioneer Trading Co., Inc. v. Pierce County, 146 Wash.App. 606, 614, 191 P.3d 928 (2008) (citing Skamania County v. Woodall, 104 Wash. App. 525, 539, 16 P.3d 701 (2001)), review denied, 165 Wash.2d 1053, 208 P.3d 554 (2009). The landowner bears the burden of establishing that a valid nonconforming use exists. The landowner "asserting a prior legal, nonconforming use bears the initial burden to prove that (1) the use existed before the county enacted the [contrary] zoning ordinance; (2) the use was lawful at the time; and (3) the applicant did not abandon or discontinue the use for over a year [prior to the relevant change in the zoning code]." First Pioneer Trading, 146 Wash.App. at 614, 191 P.3d 928 (citing Jefferson County v. Lakeside Indus., 106 Wash.App. 380, 385, 23 P.3d 542, 29 P.3d 36 (2001)). Moreover, to establish a valid nonconforming use, the use must have been more than intermittent or occasional prior to the change in the zoning legislation. North/South Airpark Ass'n v. Haagen, 87 Wash.App. 765, 772, 942 P.2d 1068 (1997). However, once the landowner establishes that a legal nonconforming use existed, the burden shifts to the municipality asserting that the nonconforming use was abandoned to show that the landowner abandoned or discontinued the use after the enactment of the relevant zoning ordinance. Van Sant v. City of Everett, 69 Wash.App. 641, 648, 849 P.2d 1276 (1993) (citing 8A EUGENE McQUILLIN, MUNICIPAL CORPORATIONS § 25.191 (3d ed. 1986)).[4]
¶ 17 "The policy of zoning legislation is to phase out a nonconforming use." Anderson, 81 Wash.2d at 323, 501 P.2d 594. This is because "[n]onconforming uses are disfavored under the law." Open Door Baptist Church v. Clark County, 140 Wash.2d 143, 150, 995 P.2d 33 (2000). Nevertheless, nonconforming uses are permitted to continue. Our Supreme Court has explained the reason for allowing such uses: "`An ordinance requiring an immediate cessation of a nonconforming use may be held to be unconstitutional because it brings about a deprivation of property rights out of proportion to the public benefit obtained.'" State ex rel. Miller v. Cain, 40 Wash.2d 216, 218, 242 P.2d 505 (1952) (quoting Austin v. Older, 283 Mich. 667, 676, 278 N.W. 727, 730 (1938)). "`In enacting [nonconforming use] ordinances... municipal authorities have had in mind the injustice and doubtful constitutionality *746 of compelling the immediate removal of the objectionable buildings already in the district, and have usually made express provision that these nonconforming uses may be continued, without the right to enlarge or rebuild after destruction.'" Cain, 40 Wash.2d at 221, 242 P.2d 505 (quoting Rehfeld v. City & County of San Francisco, 218 Cal. 83, 84, 21 P.2d 419 (1933)). Thus, local governments are motivated to allow nonconforming uses to persist in order to avoid constitutional challenges to zoning ordinances.[5] However, while "[a]s a general proposition, due process prevents the abrupt termination of what one had been doing lawfully[,][t]he protection does not generally extend beyond this purpose." Meridian Minerals Co. v. King County, 61 Wash.App. 195, 212, 810 P.2d 31 (1991).
¶ 18 As stated above, generally speaking, "[a] nonconforming use is one which lawfully existed prior to the effective date of a zoning restriction, and which is allowed to continue to exist in nonconformity with the restriction." 8A McQUILLIN, supra, § 25.180, at p. 7. In King County, a nonconforming use is currently defined as
any use ... established in conformance with King County rules and regulations in effect at the time of establishment that no longer conforms to the range of uses permitted in the site's current zone or to the current development standards of the code due to changes in the code or its application to the subject property.
King County Code (KCC) 21A.06.800. Furthermore, King County's provision regarding "establishment of uses" provides in relevant part that "[a]ll applicable requirements of this code, or other applicable state or federal requirements, shall govern a use located in unincorporated King County." KCC 21A.08.010.
¶ 19 These provisions do not explicitly require that a nonconforming use must have been lawful at the time that it was established. However, prior versions of the King County Code contained a definition of nonconforming use that more closely resembles the general description discussed by cases and commentators:
"`Nonconforming use' means a use which was lawfully established and maintained but which, because of the application of this title, no longer conforms to the use regulations of the zone in which it is located as defined by this title."
Meridian Minerals, 61 Wash.App. at 205, 810 P.2d 31 (quoting former KCC 21.04.619).[6] In fact, "[m]any ordinances do not spell out the intent to limit the [nonconforming use] exception of existing uses to those that are lawful. However, where such reference is omitted, it is inferred by the courts." 1 KENNETH H. YOUNG, ANDERSON'S AMERICAN LAW OF ZONING, § 6.11, at p. 511 (4th ed. 1996) (footnote omitted). We infer such a requirement here.
¶ 20 Nonconforming use ordinances "are not intended to protect uses which were not legally commenced or continued." PATRICIA E. SALKIN, AMERICAN LAW OF ZONING, § 12.11, at p. 12-38 (5th ed. 2009). There is, however, a significant division of judicial opinion over whether the requirement that a use be lawfully established requires compliance simply *747 with land use legislation or also with general legislation. "Where illegality results from a statutory provision not related to land use or zoning, one view is that the use does not thereby lose its status as a valid nonconforming use. Other jurisdictions, however, have declined to follow this distinction." 8A McQUILLIN, supra, § 25.186.50, at pp. 58-59 (footnote omitted). Compare Maricopa County v. Barkley, 168 Ariz. 234, 243-44, 812 P.2d 1052, 1061-62 (1990) (holding that a mining operation was entitled to status as a valid nonconforming use even without having given the requisite statutory notice that mining operations had commenced; "When there is no relationship between the alleged illegality and the zoning regulations, an exemption based on prior nonconforming use may be recognized."), with In re Chamberlin, 134 Vt. 359, 360 A.2d 100 (1976) (holding that a junkyard had not been lawfully established when the zoning code changed where the owner of the junkyard had failed to comply with licensing laws). The Supreme Court of Rhode Island aptly summarizes the competing theories:
The diversity of opinion arises as to just what renders a pre-existing use unlawful. Rathkopf ... is of the opinion that only a noncompliance with an ordinance which regulates the use of land will disqualify an individual's property from attaining the status of a legal nonconforming use. On the other hand, Yokley theorizes that any prior use of land in an unauthorized character or any business endeavor carried on in contravention of an ordinance unrelated to zoning is sufficient to disqualify a property owner from acquiring a legal nonconforming use.
Town of Scituate v. O'Rourke, 103 R.I. 499, 503, 239 A.2d 176, 179 (1968) (citing 2 CHARLES RATHKOPF & ARDEN RATHKOPF, LAW OF ZONING & PLANNING, pp. 58-172 (3d ed. 1956); EMMETT YOKLEY, ZONING LAW & PRACTICE, § 16-2, at pp. 211-13 (3d ed. 1965)).
¶ 21 No Washington court has directly decided this question. However, Division Two of our court, in its decision in First Pioneer Trading, determined that First Pioneer had failed to establish that it was lawfully using property as a manufacturing site in part because it had failed to obtain any building permits or site development review. 146 Wash.App. at 611-12, 617, 191 P.3d 928. This holding suggests that the latter rulethat an illegality, even one arising from a violation of legislation other than land use laws, would render a use unlawful such that it could not be established as a valid nonconforming useapplies in our state.[7] Here, we need not decide whether any illegality prevents a nonconforming use from being lawfully established. Rather, we are presented with the specific question of whether a nonconforming use can be lawfully established even where the individual engaging in the use of property is a trespasser.
¶ 22 The author of one treatise indicates that a literal reading of the requirement that a nonconforming use "lawfully exist" prior to the zoning change leads to the conclusion that a trespasser cannot establish a nonconforming *748 use because a trespasser is acting in violation of the law. 8A McQUILLIN, supra, § 25.186.50, at p. 57 ("In many cases the rule requiring lawful establishment and existence of a use is not applied strictly according to its literal meaning, as where an existing use involves elements of trespass." (footnote omitted) (citing Village of Skokie v. Almendinger, 5 Ill.App.2d 522, 126 N.E.2d 421 (1955); State v. Pierce, 164 Ohio St. 482, 132 N.E.2d 102 (1956))). Where the lawfulness requirement is more restricted, mandating compliance only with land use legislation, then a user's status as a trespasser would be immaterial to determining whether a use lawfully existed. If the lawfulness requirement is more inclusive, requiring compliance with general legislation in addition to land use legislation, then a valid nonconforming use could not be established where the use was accomplished only through trespass.
¶ 23 Courts of other jurisdictions, when presented with this question, disagree regarding the relevance of a user's status as a trespasser. Several state courts have interpreted the requirement that a use "lawfully exist" in a restricted manner, holding that the status of the individual engaging in a use is irrelevant to the determination of whether a valid nonconforming use was lawfully established. In particular, the rule in Pennsylvania is that "the existence of a nonconforming use is not affected by the user's title or possessory rights in relation to the owner of the land." Fayette County v. Cossell, 60 Pa.Cmwlth. 202, 205, 430 A.2d 1226, 1229 (1981). The landowner therein claimed a valid nonconforming use to operate an auto recycling center based on the fact that an adjacent property owner had previously "used 40% of the land at issue to store junked automobiles," similar to the facts presented here. Cossell, 430 A.2d at 1228. While a nonconforming use was defined as any "lawful use," the court found it insignificant that the adjacent landowner's possession of the property was without the owner's permission:
Zoning law has no application to the resolution of disputes between private parties over real estate interests. Our Supreme Court and this court have enunciated that principle in analogous cases holding that zoning status is unaffected by building and use restrictions created by private contract, and, if they are violated, the remedy is enforcement of the restrictions in a court by the persons entitled to enforcement, not by way of zoning proceedings.
Cossell, 430 A.2d at 1228-29.
¶ 24 Illinois adopted a similar rule in a case where landowners had been operating a nonconforming "trailer camp" use on two parcels that they owned and on a third parcel that they were using "without the knowledge or consent of the owner." Almendinger, 126 N.E.2d at 423. The municipal government argued that because the landowner "had no title ... or consent of the owner ..., they were trespassers or squatters and therefore wrongdoers, and accordingly could not claim for themselves the benefit of [the nonconforming use] provisions of the zoning statute." Almendinger, 126 N.E.2d at 423-24. The court disagreed, holding that the use of property by trespassers was "not unlawful within the contemplation of the statute."[8]Almendinger, 126 N.E.2d at 424. Rather, the rights of the property owners with respect to the use of the property by trespassers "were matters of concern only to the owner and the [trespassers]. The former owner had an election, and he could have claimed that use as a nonconforming one." Almendinger, 126 N.E.2d at 424.
¶ 25 In contrast, other state courts have adopted the literal meaning of the requirement that a use "lawfully exist," holding that a nonconforming use can be established only by an individual lawfully on the property and not by a trespasser. For example, in New Jersey, in a criminal prosecution, the court affirmed the defendant's conviction for violation of the township zoning ordinance based *749 on the operation of a nonconforming boat storage use. State on Complaint of Mallet v. Loux, 76 N.J.Super. 409, 414, 184 A.2d 755, 757 (1962). The defendant therein could not establish a valid nonconforming use because the user had "a status rising no higher than that of a trespasser," and state law "does not lend protection to such a use, founded as it is on trespass." Loux, 184 A.2d at 757. The court reasoned that
any appropriation of the land by [a trespasser] amounted to an unlawful use. To give nonconforming-use vitality to a disfavored use by a trespasser would serve neither the specific object of the Zoning Act provision relating to nonconforming uses ... nor the more general purpose of eliminating uses not in conformity with the municipal zoning scheme.
Loux, 184 A.2d at 757.
¶ 26 Similarly, a Delaware court held that a landowner could not establish a valid nonconforming use because, although he had used the property prior to purchasing it, he "was never granted permission to make use of [the subject property], nor was such use acquiesced in," and, thus, his use constituted a trespass. Minquadale Civic Ass'n v. Kline, 42 Del.Ch. 378, 382, 212 A.2d 811, 814 (1965). Because the landowner had no legal right to use the property prior to purchasing it, he could not successfully claim a valid nonconforming use. Kline, 212 A.2d at 815.[9]
¶ 27 We find the latter of the two theories, requiring compliance both with land use legislation and with general legislation, to be the more persuasive. Such a rule is consistent with the purpose underlying the continuance of nonconforming uses, which is to avoid potential constitutional due process challenges to zoning legislation arising from deprivations of property rights. Miller, 40 Wash.2d at 218, 242 P.2d 505. It is the property owner whose property rights are affected by changes in zoning legislation, and, thus, it is the property owner who is afforded constitutional due process protection. However, such constitutional concerns do not arise where a trespasser is prevented from continuing a use of another's property, as the trespasser was never authorized to use that property in the first instance. Trespassers have no constitutional property right in the land they are trespassing upon, and, thus, they have no right to due process concerning that land.
¶ 28 Such a rule is also consistent with the principle that "[n]onconforming uses are disfavored under the law," Open Door Baptist Church, 140 Wash.2d at 150, 995 P.2d 33, and with the policy of phasing out nonconforming uses. Anderson, 81 Wash.2d at 323, 501 P.2d 594. Accordingly, we hold that a trespasser cannot establish a valid nonconforming use. A person claiming a valid nonconforming use must prove that the use was established by a lawful user of the property prior to the enactment of the relevant zoning restriction.
¶ 29 Thus, contrary to McMilian's contention, the hearing examiner correctly ruled that a trespasser may not establish a valid nonconforming use.[10]

*750 IV
¶ 30 Although the hearing examiner employed the correct legal rule regarding the lawful establishment of nonconforming uses, the hearing examiner did not correctly apply this principle to the facts herein.
¶ 31 The hearing examiner did not make any express finding that any use of the southern property as part of the wrecking yard was accomplished through a trespass. Rather, the hearing examiner found only that the owners of the southern property had not given express permission or endeavored to evict the operators of the wrecking yard. By concluding that McMilian had not established a legal nonconforming use on these facts, the hearing examiner could only have presumed that, absent explicit agreement or permission, a user of another's property must be a trespasser and, therefore, that McMilian's predecessors in interest, who had used a portion of the southern parcel for wrecking yard purposes, were trespassers onto the southern parcel.
¶ 32 This is not the correct legal standard. Cf. Kunkel v. Fisher, 106 Wash. App. 599, 23 P.3d 1128 (2001) (trial court erred by failing to apply the presumption that plaintiff's use of adjacent property was permissive when determining whether plaintiff had established a prescriptive easement, which is disfavored in the law). Rather, a property owner's acquiescence in another's use can be established in a number of ways, not merely through express permission. "Permission can be express or implied. A permissive use may be implied in `any situation where it is reasonable to infer that the use was permitted by neighborly sufferance or acquiescence.'" Kunkel, 106 Wash.App. at 602, 23 P.3d 1128 (footnote and internal quotation marks omitted) (quoting Lingvall v. Bartmess, 97 Wash.App. 245, 251, 982 P.2d 690 (1999)); see also Cuillier v. Coffin, 57 Wash.2d 624, 626, 358 P.2d 958 (1961) ("The fact that no permission was expressly asked, and that no permission was expressly given, does not preclude a use from being permissive."); Lingvall, 97 Wash.App. at 251, 982 P.2d 690. "[O]ne who goes upon the premises of another, either without any invitation, express or implied, or else for some purpose not connected with the business conducted on the land, but goes nevertheless with the permission or at the toleration of the owner" is a licensee rather than a trespasser. Enersen v. Anderson, 55 Wash.2d 486, 488, 348 P.2d 401 (1960) (citing Dotson v. Haddock, 46 Wash.2d 52, 278 P.2d 338 (1955)). Moreover, where the property in question is "vacant, open, unenclosed, and unimproved," use by an individual other than the landowner is presumed to be permissive. Sharp v. Kieszling, 35 Wash.2d 620, 623, 214 P.2d 163 (1950); Granite Beach Holdings, LLC v. Dep't of Natural Res., 103 Wash.App. 186, 200, 11 P.3d 847 (2000). "[W]hen one enters into the possession of another's [vacant, open, unenclosed, and unimproved] property, there is a presumption that he does so with the true owner's permission and in subordination to the latter's title."[11]State ex rel. Shorett v. Blue Ridge Club, 22 Wash.2d 487, 494-95, 156 P.2d 667 (1945): see also Nw. Cities Gas Co. v. W. Fuel Co., 13 Wash.2d 75, 84, 123 P.2d 771 (1942). In such a case, the landowner is effectively permitting the use of the property, which is beneficial to the landowner. By virtue of permitting another individual's use of the property, the landowner *751 obtains the right to continue that use even after it becomes a nonconforming use. Any right to continue an established nonconforming use is, in fact, that of the landowner, not that of the other individual using the property. It is the landowner's entitlement to continue the valid nonconforming use that is implicated. Due process protects the landowner from being forced to immediately cease any nonconforming use of the property. The landowner can also permit another to continue such a use on the property.
¶ 33 Accordingly, the hearing examiner erred by presuming that, because the owners of the southern parcel had not explicitly agreed to or permitted the wrecking yard operator's use of the southern parcel, the operators of the wrecking yard were necessarily trespassing onto the southern parcel. Because the southern parcel was vacant, open, unenclosed, and unimproved, the presumption that the southern parcel owner acquiesced in another's use of that property applies. See Sharp, 35 Wash.2d at 623, 214 P.2d 163; Blue Ridge Club, 22 Wash.2d at 494-95, 156 P.2d 667. Therefore, were McMilian able to establish that the southern parcel was being used by the operators of the wrecking yard prior to 1958, then McMilian is entitled to the presumption that the operators of the wrecking yard were using the southern parcel "with the true owner's permission." Blue Ridge Club, 22 Wash.2d at 494-95, 156 P.2d 667.

V
¶ 34 McMilian contends that the hearing examiner found that the wrecking yard use existed on the southern parcel prior to 1958. Contrary to McMilian's assertions, however, no such finding is in the record.
¶ 35 For his contention, McMilian relies only on the hearing examiner's finding that:
An auto wrecking business has long been conducted on the property directly abutting to the north, under a series of ownerships. During prior ownerships, some spillover of the auto wrecking operation occurred onto the subject property, which was not owned by the prior ownerships of the auto wrecking business (it was purchased by Appellants after their purchase of the main Astro Auto Wrecking site abutting to the north). The spillover consisted of storage of some wrecked and dismantled cars and numerous junk auto parts and tires. The property was not utilized in active auto wrecking operations as was the main operation to the north.
CP at 110 (emphasis added). The hearing examiner did not make any finding with regard to whether the wrecking yard use was established on the southern parcel prior to 1958, only that it "has long been conducted" on the northern parcel and that some spillover had occurred onto the southern parcel. We cannot, on this basis, conclude that McMilian has met his burden to prove by a preponderance of the evidence that the wrecking yard use was established prior to 1958, as necessary to establish that a nonconforming use then existed.[12] There is evidence in the record that would support either a finding that the southern parcel had been used for the wrecking yard prior to 1958 or, conversely, a finding that the southern parcel had not been so used prior to 1958. Accordingly, we remand to the hearing examiner for a determination of whether the wrecking yard use existed on the southern parcel prior to 1958.[13]

*752 VI
¶ 36 McMilian next contends that the hearing examiner erred by determining that McMilian's clearing activities required a clearing permit. We disagree.
¶ 37 Pursuant to the King County Code, a permit is required for all clearing of 7,000 square feet or more of property, unless a specific exception applies. KCC 16.82.050; KCC 16.82.051(C)(3) All exemptions to the permit requirement are set forth in a table. KCC 16.82.051(B). There are exemptions for maintenance of driveways; farm field access roads; utility corridors; surface water conveyance systems; outdoor public facilities and parks; agricultural drains and ponds; cemetery graves; lawns, landscaping, and gardening for personal consumption; and golf courses. Most of these exemptions are conditioned on the requirement that they be done
in conjunction with normal and routine maintenance activities, if:
a. there is no alteration of a ditch or aquatic area that is used by salmonids;
b. the structure, condition or site maintained was constructed or created in accordance with law; and
c. the maintenance does not expand the roadway, lawn, landscaping, ditch, culvert or other improved area being maintained.
KCC 16.82.051(C)(13).
¶ 38 Despite McMilian's contentions to the contrary, no exemption exists for routine maintenance of a wrecking yard. Accordingly, McMilian was required to obtain a clearing permit in order to clear over 7,000 square feet of property. Ample evidence in the record supports the hearing examiner's finding that McMilian cleared the vast majority of his 1.9-acre lot of vegetation.[14] Accordingly, the hearing examiner properly sustained King County's charge of violation for failure to obtain a permit for the clearing activity.

VII
¶ 39 McMilian requests an award of attorney fees pursuant to RCW 4.84.370.[15] Given that neither party prevailed in all proceedings, as envisioned by the statute, no attorney fees can be awarded herein pursuant to this provision.[16]

VIII
¶ 40 We remand the matter to the hearing examiner for a decision, based on the existing record, as to whether McMilian established that the wrecking yard use was extant on the southern parcel prior to 1958. If the hearing examiner determines that McMilian met his burden to prove this fact, the presumption of permissive use of the property applies, and the hearing examiner must decide whether McMilian has proved that a valid nonconforming use exists on the southern parcel.
¶ 41 Affirmed in part and remanded.
We concur: ELLINGTON and BECKER, JJ.
NOTES
[1] In his appeal from the hearing examiner's decision to the superior court, pursuant to the Land Use Petition Act (LUPA), chapter 36.70C RCW, McMilian assigned error to several of the hearing examiner's findings of fact, including findings of fact 4, 6, 7, 8, 11, 12, 13, and 14. The hearing examiner's findings of fact will be sustained where they are supported by substantial evidence. RCW 36.70C.130(1)(c). A review of the record reveals that each of the challenged findings is supported by substantial evidence.
[2] The hearing examiner determined that King County had not alleged a grading violation but rather had alleged only a clearing violation. Thus, although there was evidence that a grading permit was necessary, grading issues were disregarded in the hearing examiner's disposition of the case. This is not an issue before us.
[3] RCW 36.70C.130(1) provides six bases for relief:

(a) The body or officer that made the land use decision engaged in unlawful procedure or failed to follow a prescribed process, unless the error was harmless;
(b) The land use decision is an erroneous interpretation of the law, after allowing for such deference as is due the construction of a law by a local jurisdiction with expertise;
(c) The land use decision is not supported by evidence that is substantial when viewed in light of the whole record before the court;
(d) The land use decision is a clearly erroneous application of the law to the facts;
(e) The land use decision is outside the authority or jurisdiction of the body or officer making the decision; or
(f) The land use decision violates the constitutional rights of the party seeking relief.
[4] King County attempts to misplace the burden on the landowner, McMilian, to establish that the alleged legal nonconforming use was not abandoned after 1958. However, once a landowner has proved that a valid nonconforming use was lawfully established at the time the relevant zoning code was enacted, the burden of proving that a nonconforming use was subsequently abandoned, such that it should no longer be recognized, is properly placed on the party asserting abandonment, here King County.
[5] Consistent with the purpose underlying the continuation of legal nonconforming usesto avoid potential constitutional due process challenges to zoning codesis the rule that "a vested right to a nonconforming use cannot exist unless the particular use in question is in fact established prior to the enactment of the zoning ordinance." Anderson, 81 Wash.2d at 321, 501 P.2d 594 (emphasis added). Where the property owner only contemplated or intended the use but did not actually establish such a use prior to the passage of a contrary zoning ordinance, there is no existing right that implicates due process concerns. See Anderson, 81 Wash.2d at 321-22, 501 P.2d 594.
[6] In 1958, when the wrecking yard use became a nonconforming use, the definition of nonconforming use was:

A use lawfully established and maintained that does not conform with the regulations of the use district in which it is situated by reason of the adoption of Districting (Zoning) Resolution No. 6494 (June 2, 1937).
JOURNAL OF PROCEEDINGS OF CNTY. COMM'RS, KING COUNTY, Res. No. 18801, § 2.15, at p. 329 (King County, Wash. Aug. 12, 1958), available at http:// www.kingcounty.gov/operations/archives/ environmentalhistory/~/media/operations/ archives/documents/RES18801Part1.ashx, http:// www.kingcounty.gov/operations/archives/ environmentalhistory/~/media/operations/ archives/documents/RES18801Part2.ashx.
[7] We are aware of our decision in Van Sant v. City of Everett, 69 Wash.App. 641, 849 P.2d 1276 (1993), wherein we made reference to the former, more restricted theory: "Courts have repeatedly found that licensing and other regulations unrelated to land use approval, whether business licensing, business and occupation tax regulations, or building permits, are not per se determinative of the continuance of a nonconforming use." 69 Wash.App. at 651-52, 849 P.2d 1276. Therein, we held that the absence of business licenses and records and business and occupation tax records, evidencing the landowner's failure to comply with the city's ordinances, was not per se determinative of the question of whether the nonconforming use had been abandoned but it could be considered in determining whether a nonconforming commercial use had been abandoned because "violation of such ordinances may be evidence of an intent to abandon." Van Sant, 69 Wash.App. at 652-53, 849 P.2d 1276.

Our decision in Van Sant is not, however, determinative of the question presented herein because the present case regards the question of whether a nonconforming use was ever validly established in the first instance rather than the question of whether a validly established nonconforming use had subsequently been abandoned. In Van Sant. we recognized that this was an important distinction: "[T]he City's cases are distinguishable. [In those cases,] there was no previous finding of a nonconforming use ... [and] the landowner's right to nonconforming use had never actually vested. In contrast, in the present case the nonconforming commercial use clearly vested in 1972." Van Sant, 69 Wash.App. at 652, 849 P.2d 1276 (citation omitted).
[8] The Illinois court so held, in part, because it interpreted the legislative intent in the zoning code to require "liberal construction" in order to give "due allowance ... for existing conditions... and the uses to which the property is devoted." Almendinger, 126 N.E.2d at 424. Thus, the court determined, "the question of title is not of paramount importance." Almendinger, 126 N.E.2d at 424.
[9] Ohio has adopted a similar rule, with the Supreme Court of Ohio holding that licensees could establish a valid nonconforming use. Pierce, 132 N.E.2d at 105. The court determined that individuals who had entered property to hunt, fish, and boat where the owner had "made no effort to keep them off" were licensees rather than trespassers. Pierce, 132 N.E.2d at 104-05. The court reversed the judgment against the defendant because he had established that a nonconforming use existed because such use was made by licensees prior to the change in the zoning code. Pierce, 132 N.E.2d at 105-06. The court's opinion suggests that, had the users been trespassers, a valid nonconforming use would not have been established.
[10] McMillan primarily contends that the status of the user of the land is irrelevant because nonconforming use rights run with the land rather than with the landowner. It is true, as McMilian emphasizes, that once a nonconforming use is established, the right to continue the nonconforming use runs with the land rather than with the landowner:

The right to maintain a nonconforming use does not depend upon ownership or tenancy of the land on which the use is situated. The right attaches to the land itself; it is not personal to the current owner or tenant. Accordingly, a change in the ownership or tenancy of a nonconforming business or structure does not affect the right to continue the nonconforming use.
2 SALKIN, supra, § 12.40, at pp. 12-153, 12-154 (footnotes omitted); see also City of Univ. Place v. McGuire, 102 Wash.App. 658, 669, 9 P.3d 918 (2000) (citing 1 ROBERT M. ANDERSON, AMERICAN LAW OF ZONING, § 6.40, at pp. 569-70 (3d ed. 1986)), reversed on other grounds, 144 Wash.2d 640, 30 P.3d 453 (2001). However, this principle is not determinative of whether a valid nonconforming use was established in the first instance. Rather, there is an important difference between whether a landowner can establish a nonconforming use and whether an established nonconforming use continues to exist. See Van Sant, 69 Wash.App. at 650, 849 P.2d 1276.
[11] Such a presumption is not afforded to those using lands that are not vacant and unimproved. Drake v. Smersh, 122 Wash.App. 147, 154, 89 P.3d 726 (2004) ("In developed land cases, when the facts in a case support an inference that use was permitted by neighborly sufferance or accommodation, a court may imply that use was permissive and accordingly conclude the claimant has not established the adverse element of prescriptive easements. In contrast, courts should apply the `vacant lands doctrine' and its presumption of permissive use only in cases involving undeveloped land because, in those cases, owners are not in the same position to protect their title from adverse use as are owners of developed property.").
[12] The superior court found that "the subject parcel has been used as a storage yard in conjunction with the adjoining automobile wrecking yard since prior to 1958." CP at 733. However, we review the hearing examiner's findings and do not give any deference to the superior court's findings. Griffin v. Thurston Cnty. Bd. of Health, 165 Wash.2d 50, 55, 196 P.3d 141 (2008).
[13] King County contends that, were we to find that the wrecking yard use on the southern parcel qualifies as a valid nonconforming use, we could affirm the hearing examiner's decision on the basis that McMilian illegally intensified the wrecking yard use. However, King County's notice of violation and order did not allege that McMilian illegally intensified the nonconforming use of the wrecking yard. The hearing examiner declined to reach this issue, as did the superior court. King County provides no authority that would allow us to review this issue. Accordingly, we decline to address the possibility of illegal intensification.
[14] There was testimony that the southern parcel was almost two acres in size. Aerial photographs reveal that practically all of the southern parcel was cleared of vegetation before the 2005 photograph was taken. Further, there was testimony from DDES employees that 1.7 acres of the southern parcel's 1.9 acres were cleared.
[15] RCW 4.84.370 authorizes an award of attorney fees to the prevailing party before the Court of Appeals where that party also prevailed before the local government and in all prior judicial proceedings.
[16] Given that McMilian is not the substantially prevailing party here, it is unnecessary for us to reach McMillan's challenge to the constitutionality of RCW 4.84.370.